O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. CR 08-00982 (B) DDP |
| | ) | |
| Plaintiff, | ) | **FINDINGS OF FACT AND CONCLUSIONS** |
| | ) | **OF LAW FOLLOWING BENCH TRIAL** |
| v. | ) | |
| | ) | |
| KEVIN BRIAN LEDGARD, | ) | [Docket No. 183] |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

This case proceeded to trial before this court on July 17, 2012.  Following the close of evidence on July 18, 2012, trial was continued to August 31, 2012, during which the court heard extensive argument on Defendant's Motion to Dismiss All Felony Charges.  After fully weighing and considering all of the evidence presented during the trial, as well as argument made by the parties on August 31, 2012, the court hereby finds Defendant guilty on Counts One through Five and Counts Nine through Eleven of the Second Superseding Indictment ("Indictment"), and not guilty on Counts Six Through Eight, as follows and for the reasons stated on the record and herein.

**FACTUAL FINDINGS**

**A.   Defendant's Relationship With, and Knowledge Regarding, F.G.**

Defendant and F.G. met in approximately 2004, when they worked together at PSI in Burbank, California.  (Reporter's July 17, 2012 Transcript ("7/17/12 RT") 98:12-25).  Defendant was then the Director of Finance; F.G. held an administrative position and later held a position as client services consultant. (7/17/12 RT 99:1-11).  Defendant and F.G. began dating in approximately October 2005, and continued their relationship for approximately two years. (7/17/12 RT 100:7-21).  During their relationship, Defendant was married, but told F.G. that his relationship with his wife was not going well, that he and his wife were separated or were separating, and that they were going to get divorced, all of which F.G. believed.  (7/17/12 RT 100:22-101:5).

During their relationship, F.G. lived with her parents. (7/17/12 RT 19:14-19; 99:19-25).  Defendant was living in San Diego County.  (7/17/12 RT 100:1-3).  Defendant knew that F.G. lived with her parents.  (7/17/12 RT 101:25-102:2).  F.G. did not tell her parents about Defendant because he was married and she wanted to wait until his marriage had ended first.  (7/17/12 RT 101:17-24). F.G. told Defendant how close she was with her family and that her relationship with her family meant a lot to her.  (7/17/12 RT 102:3-9).  Defendant was curious about F.G.'s Armenian culture and her family, and they spoke frequently about F.G.'s culture. (7/17/12 RT 102:9-20).

During their relationship, Defendant was aware of F.G.'s limited finances and knew F.G.'s salary at PSI.  (7/17/12 RT 103:24-104:9).  Defendant even helped F.G. plan a budget so she

1  could afford to buy a car and still be able to pay her bills,

2  including paying her mother $300 every two weeks.  (7/17/12 RT

3  104:9-105:17).

4      During their relationship, F.G. and Defendant discussed F.G.'s

5  desire to attend graduate school at Alliant University.  (7/17/12

6  RT 105:18-106:7).  Defendant even assisted F.G. by reviewing her

7  personal statement and writing a letter of recommendation for F.G.

8  to submit with her application to Alliant.  (7/17/12 RT 106:7-

9  107:24; 109:1-25; Exs. 27, 40).[1]  During this time, F.G. was

10  communicating via email with Brian Evans, the Director of

11  Admissions at Alliant University's Fresno campus, through his

12  university email account.  (7/17/12 RT 108:16-25; 7/18/12 RT 36:13-

13  37:3).

14      During their relationship, F.G. told Defendant that the number

15  "5" was her favorite number because it was her high school

16  volleyball number.  (7/17/12 RT 110:12-22).

17      During their relationship, F.G. allowed Defendant to take nude

18  photographs of her, including photographs while F.G. and Defendant

19  were engaged in sexual activity.  (7/17/12 RT 110:23-111:7).  A few

20  days after they were taken, F.G. asked Defendant to delete the

21  photographs, which were on Defendant's external computer hard

22  drive, and explained to him she would feel more comfortable if they

23  were deleted.  In response, Defendant deleted the photographs from

24  his hard drive in front of F.G.  (7/17/12 RT 111:12-112:8).

25

26      [1]  With the exception of the transcripts of Defendant's
27  recorded statements, all exhibit references refer to the
   Government's exhibits admitted into evidence at trial.  Since there
28  were no defense exhibits, the court herein refers to the term "Ex."
   rather than "Gov. Ex."

3

1  Defendant knew that distribution of these photographs, especially
2  to F.G.'s family and friends, would be particularly upsetting to
3  F.G. given her many discussions with Defendant regarding her family
4  and Armenian culture, including that certain things should remain
5  private and that a woman should not engage in sexual relations
6  until after marriage.  (7/17/12 RT 125:22-126:21).

7  **B.   F.G.'s Breakup with Defendant**

8       In December 2006, F.G. discovered that Defendant had a six-
9  month old child that he had never told her about and she began to
10 second guess the relationship.  (7/17/12 RT 112:9-20).  Defendant
11 did not want his relationship with F.G. to end and gave F.G.
12 excuses every month as to why he could not make a commitment to
13 F.G.; Defendant claimed that he and his wife were still getting
14 divorced, that he would be serving his wife with divorce papers,
15 and that F.G. should "stick around."  (7/17/12 RT 112:21-113:9).
16 By August, F.G. was starting to not believe Defendant.  (7/17/12 RT
17 113:10-15).  F.G. delayed breaking up with Defendant, in part
18 because he had been threatening to distribute the sexually explicit
19 photographs of F.G., which she learned he had not deleted.
20 (7/17/12 RT 179:20-180:6).

21      On or about August 10, 2007, Defendant left PSI and started
22 working for Red Mango in Culver City, California.  (7/17/12 RT
23 172:13-19).

24      On August 11, 2007, F.G. met J.B. at their mutual friends'
25 wedding.  (7/17/12 RT 141:25-142:9; 7/18/12 RT 23:9-14).

26      On September 10, 2007, F.G. finally ended her relationship
27 with Defendant.  (7/17/12 RT 113:18-25).

28 ///

4

**C.  <u>Defendant's Campaign to Destroy Every Facet of F.G.'s Life</u>**

Soon after Defendant started working at Red Mango, he called his friend, C.V., who still worked at PSI, and asked C.V. if C.V. could give F.G.'s email password to Defendant so he could have access to F.G.'s email.  (7/17/12 RT 80:20-84:2).  Defendant tried to bribe C.V. by offering to show him a slideshow of F.G.  (7/17/12 RT 83:10-12).  Even when C.V. declined, Defendant continued to ask him for this information, and then asked if C.V. could take a photograph of F.G.'s cubicle.  (7/17/12 RT 84:6-23).  After multiple calls from Defendant, C.V. finally took a photograph of F.G.'s cubicle with C.V.'s cell phone and emailed it to Defendant.  (7/17/12 RT 84:23-85:6).

Sometime in early September 2007, Defendant, C.V., and two other individuals went to lunch in Burbank.  Defendant brought his laptop, opened it up and showed the group a Powerpoint digital slideshow containing sexually explicit photographs of F.G. along with derogatory captions regarding the photographs.  (7/17/12 RT 85:25-87:5).  Defendant made the slideshow and said that he and F.G. had broken up, and he "was going to destroy her life." (7/17/12 RT 87:6-21).  Defendant said he was going to send the slideshow to everyone, including F.G.'s father, which C.V. thought was bad given the nature of the photographs.  (7/17/12 RT 88:6-21). When C.V. told Defendant not to send the slideshow to F.G.'s father, Defendant got angry at C.V. and asked why he was defending F.G.  (7/17/12 RT 88:18-24).

Approximately one week before F.G. broke up with Defendant, she noticed that her Hotmail email inbox was either fully or partially deleted and she eventually lost access to her account.

1  (7/17/12 RT 114:1-115:2; 200:18-202:4).[2]  On September 10, 2007,

2  the day F.G. broke up with Defendant, he created email account

3  tee.eye@hotmail.com[3] and used that account to send the following

4  email to F.G. at her office:

5      Whats up bitch? After a year and a ½, Im starting to get my
       revenge on a dirty lying slut who puts shame on her people
6      and culture every day of her shitty, worthless life. It
       feels very good to have justice right now...I like how it
7      feels to fuck you up.  Ha ha ha!!!!

8  (Ex. 17, BS 1905).

9      The next day, September 11, 2007, Defendant accessed F.G.'s

10 Bank of America account, including her checking account ending in

11 5807 ("F.G.'s BofA account"), using Bank of America's online

12 banking service without F.G.'s knowledge or authorization.

13 (7/17/12 RT 129:21; 148:8-154:3; Ex. 43).  That morning, after

14 several failed attempts, Defendant successfully logged into F.G.'s

15 Bank of America account using F.G.'s real log-in ID and password,

16 and proceeded to make changes which would not only prevent F.G.

17 from accessing her account, but would also prevent her from being

18 alerted to these changes.  For example, during that session, he

19 changed F.G.'s log-in ID from "[F.G.]" to "[F.2007G.]," changed her

20 password, changed her security questions, changed her account

21 address (including zip code) and telephone number,[4] and changed her

22

23  ─────────────

24     [2]  The evidence showed that the contents of F.G.'s address
    book in her Hotmail account were deleted on September 7, 8, and 11,
25  2007.  (Ex. 16, BS 1893-94; 7/17/12 RT 200:22-202:4).

26     [3]  T.I. are the initials of F.G.'s ex-boyfriend.  (7/17/12 RT
    117:10-15).

27     [4]  Defendant made these changes to both F.G.'s checking
28  account and her Bank of America Mastercard credit card ending in
    3835.  (Ex. 43).

email address.[5]  (7/17/12 RT 47:18-51:6; 56:24-57:4; 58:15-60:22; Exs. 3, 7, 8, 43, 50).[6]

That same day, September 11, 2007, Defendant accessed F.G.'s Bank of America account online without authorization six times. (7/17/12 RT 56:11-19; Exs. 3, 7).  After making the above-described security changes, Defendant had exclusive online access to F.G.'s account and did the following in the account, among other things:

- Defendant viewed and printed records of F.G.'s checking account activities from May through September 10, 2007; the first page of each of the statements reflects that $330.67 was the "Available balance as of 09/11/2007." (7/17/12 RT 44:14-23; 56:9-58:25; Exs. 7, 43).

- Defendant printed an image of a check F.G. had written to her mother in the amount of $300.00, which posted on September 5, 2007.  (7/17/12 RT 44:24-45:23; Exs. 7, 43).

- Defendant used the online "bill pay" feature to set up a single payment in the amount of $330.67 to be issued from the account payable to F.G.'s mother.  (Ex. 1; Ex. 7, p.2, row 77;[7] Ex. 21, p.2).

- Defendant used the online "bill pay" feature to set up a "recurring payment" in the amount of $555.55[8] to be issued from the account and sent to F.G.'s mother.  (Ex. 7, p.2, row 87; Ex. 21, p.2).  (A "recurring payment" is automatically issued from the account on a continuing basis for the amount and length of time requested (i.e. monthly, biweekly) until it is cancelled by the account holder.)  (7/17/12 RT 58:1-14; Ex. 3).

---

[5]  As a result of Defendant changing her account email address, F.G. would not have received any email "alerts" from Bank of America regarding Defendant's changes to her account log-in ID and password or other account activity.

[6]  See Ex. 50, which is a text document found in Defendant's computer listing the changes Defendant made to various accounts, including F.G.'s Bank of America account.

[7]  F.G. never used the bank's online "bill pay" system. (7/17/12 RT 139:20-140:5).  Thus, Defendant had to add F.G.'s mother as a "new individual payee" when he set up bill pay for the $330.67 check.  (Ex. 7, p.2, row 74).

[8]  As noted above, Defendant knew that "5" was F.G.'s favorite number.

- Defendant used the online "bill pay" feature to set up a single payment in the amount of $555.55 to be issued from the account to F.G.'s friend, A.A.  (Ex. 7, p.4, Row 180; Ex. 21, p.2).[9]

- Defendant used the online "bill pay" feature to set up another "recurring payment," this time in the amount of $255.55 to be issued from the account.  (Ex. 7, p.4, Row 190; 7/17/12 RT 58:1-14).[10]

F.G. did not conduct or authorize any of the above activities with her Bank of America account.  (7/17/12 RT 148:8-154:3).

On September 12, 2007, Defendant did the following:

- Defendant sent another email to F.G. from tee.eye@hotmail.com:  "Today it all starts to fall to pieces for you.  Great!  I cant wait for the crying bitch to come out."  (Ex. 17, BS 1909).

- Defendant sent two messages to J.B. on J.B.'s Myspace account disparaging F.G. in an attempt to persuade J.B. to cease all contact with F.G.  (Exs. 45-46).

- Defendant created the email address: truth.about.[f.g.]@hotmail.com.  (Ex. 18).

- Defendant posted a letter and pornographic photographs of F.G. on the door of what Defendant evidently thought was J.B.'s residence but which was, in fact, J.B.'s former residence.[11]  (Ex. 18, BS 1922).

---

[9]  For the same reason, Defendant had to add A.A. as a "new individual payee" when he set up bill pay for that check.  (Ex. 7, p. 4, row 177).

[10]  This check was never issued, presumably because Defendant's conduct had been discovered by then.

[11]  The court bases this finding on the multiple "Attention [J.B.]" flyers found in Defendant's car (Ex. 43) and in his computer (Exs. 56-58), as well as the September 13, 2007 email from o2lifted@hotmail.com to truth.about.[f.g.]@hotmail.com, with the subject line "door posting," stating:

I received the letter and pictures that were posted on my door last night. The thing is that this [J.B.] guy does not live here anymore.  My friends and I took over the house more than two years ago the only reason I know of him is because some of his mail would come from time to time.  So I would appreciate it if in the future I don't come home to
(continued...)

8

On Friday, September 13, 2007, Defendant sent F.G. another email from tee.eye@hotmail.com:  "Tomorrow will we [sic] worse." (Ex. 17, BS 1911).

Also on September 13, 2007, Defendant used F.G.'s username and password without her knowledge or authorization to access F.G.'s Hotmail account, fg41125@hotmail.com ("F.G.'s Hotmail account"), and sent F.G. an email from her own Hotmail account, stating: "Quit trying.  You're not intelligent enough to figure it out." (Ex. 25).[12]  F.G.'s Hotmail account was the email account she used for personal, non-work related communications.  (7/17/12 RT 102:24-103:8).  F.G. never gave her username or password for her Hotmail account to Defendant, and never authorized him to access her Hotmail account or make any changes to the account.  (7/17/12 RT 103:9-23).[13]

In addition, on September 13, 2007, Defendant used F.G.'s username and password without her knowledge or authorization to access F.G.'s Amazon.com account and made the following three purchases totaling $7,004.00 using F.G.'s Citibank Mastercard associated with her Amazon account: (1) a dining table and four

---

[11](...continued)
more information about some girl I have never seen before or want to see for that matter.  Thanks.

(Ex. 18, BS 1922).

[12]  The court further finds based on the evidence presented at trial that this email was not contained in the Microsoft records for fg41125@hotmail.com because Defendant deleted the email content in that account.

[13]  The connection logs for F.G.'s Hotmail account indicate that between August 14, 2007, and September 18, 2007, Defendant accessed F.G.'s Hotmail account approximately 273 times, from both his home and office, and at all times of the day and night.  (See Ex. 16).

chairs for $2,598.00; (2) a ruby ring for $2,899.00; and (3) a Sony large screen television for $1,507.14.  The items were to be shipped to the address on record for the account, which was F.G.'s home address (where she lived with her parents).  (7/17/12: 130:25-132:9, 187:5-189:13, Ex. 33).  F.G.'s available credit on her Citibank Mastercard as of September 11, 2007, was $6,774.  (7/17/12 RT 130:3-132:9; Ex. 22).  F.G. did not authorize Defendant to access her Amazon.com account or make those purchases.  (7/17/12 RT 131:6-132:9).[14]

Also on September 13, 2007, Defendant created email account truth.for.gary@hotmail.com[15] and sent a series of emails from that account to F.G.'s father, who was then in Japan.  (Ex. 19).  In his emails to F.G.'s father, Defendant (anonymously) stated that F.G. had been lying to her parents about her whereabouts, that F.G. was having "unprotected sex with an unavailable stranger" named "Jesse" (J.B.), that she was having unprotected sex with "other guys," and that a doctor believed F.G. was pregnant and had venereal disease.  (Ex. 19, BS 2107, 2148, 2303).  As proof of the "truth" of what Defendant was claiming about F.G., Defendant attached six photographs depicting F.G. nude or engaging in sexual acts, which Defendant had taken during their relationship.  (Ex. 19, BS 1951).  Defendant falsely claimed that the attached photographs were taken by a man with whom F.G. was allegedly having unprotected sex.

---

[14]   F.G. discovered the purchases when Citibank called her to verify the purchases.  (7/17/12 RT 129-10-11; Ex. 33).  After F.G. informed Citibank that she had not made those purchases, Citibank notified Amazon that the charges were fraudulent and the transactions were thereafter cancelled by Amazon.com before shipment.  (7/17/12 RT 191:9-192:1).

[15]   Gary is F.G.'s father's name.

1   (Id.).  When F.G.'s father would not look at the photographs,

2   Defendant reattached the photographs and repeatedly urged F.G.'s

3   father to look at them:

4   •       As you can see from the photographs, it's in your best
            interest to hear me out.... (Ex. 19, BS 1972).
5

6   •       You need to look at the pictures to know that I'm telling
            you the truth and that you need to act, to call [F.G.'s
            mother] and tell her to open her eyes and stop this
7           madness.  (Ex. 19, BS 1995).

8   •       I'm re-sending the pictures because I fear that you
            failing to look at them, even if only briefly, results in
9           you not understanding the magnitude of what's going on
            here.  Please, I beg of you. Look at the pictures
10          briefly.... (Ex. 19, BS 2107-2119; emphasis added).

11  •       I firmly believe you need to look at these pictures – if
            only briefly – to comprehend the magnitude of these
12          problems.  Please just look at them to confirm all of
            this information, it will provide you with clarity of
13          thought.  (Ex. 19, BS 2148).

14       Defendant also urged F.G.'s father to "act" by, among other

15  things, keeping F.G. away from her friends, including A.A., A.A.'s

16  friends, and "somebody named Jesse," and that they should "keep an

17  eye on [F.G.] at all times" and "prevent her from going out without

18  an airtight explanation."  (Ex. 19, BS 2303).

19       Defendant sent the emails and attached photographs to F.G.'s

20  father's personal email address, which was listed in her Hotmail

21  address book, and which F.G. used to email her father.  (7/17/12 RT

22  120:17-122:8; 134:4-17, Exs. 16, 19).

23       During this email exchange with Defendant, F.G.'s father

24  called F.G.'s mother and told her that he had received the emails,

25  F.G. was in danger, and she needed to pick up F.G. from work at PSI

26  and bring her home.  (7/17/12 RT 20:5-21:10).  When F.G.'s mother

27  arrived at PSI, F.G. was crying.  (7/17/12 RT 21:11-21:13).  F.G.

28  told her mother that she couldn't talk there because everybody

1  would hear them, so they left PSI and parked on the street.

2  (7/17/12 RT 21:13-21:25).  Defendant was aware that F.G., crying,

3  left PSI with her mother.  The court makes this finding based on

4  the email sent by Defendant from the truth.for.gary@hotmail.com

5  account to F.G.'s father, in which Defendant states:  "I just heard

6  from a former employee of mine that he saw [F.G.'s mother] come to

7  the office, and [F.G.'s mother] left with her, bawling her eyes

8  out."  (Ex. 19, BS 2451; emphasis added).

9      While parked in the car on the street, F.G.'s mother asked

10  what was going on, and F.G. told her mother, in substance, about

11  the pictures taken by Defendant and that Defendant would not let

12  her end the relationship.  (7/17/12 RT 21:21-22:16).  During this

13  conversation, F.G. was scared, crying, and could not get the words

14  out.  F.G. felt ashamed that this had happened to her.  F.G.'s

15  mother had never seen F.G. like that before.  (7/17/12 RT 22:15-

16  22:20; 128:7-20).

17      F.G.'s mother then drove them home and after arriving, F.G.

18  was still upset and crying.  (7/17/12 RT 22:23-22:24).  When asked,

19  F.G. told her mother more about the events that had occurred.

20  (7/17/12 RT 22:24-23:7).  Also, the same day, Defendant repeatedly

21  called F.G.'s home and shouted at F.G.'s mother on the telephone

22  while saying disparaging things and making accusations about F.G.

23  Although F.G.'s mother told Defendant to stop calling and to leave

24  her family alone, Defendant kept calling their home so many times

25  that F.G.'s mother finally had to unplug the telephone.  (7/17/12

26  RT 23:9-25; 26:2-6).  At some point that day, F.G.'s mother told

27  F.G. that the nude photographs were sent to her father with the

28

emails, which made F.G. feel embarrassed and ashamed.   (7/17/12 RT
123:9-15).

 F.G. and her family were so scared of Defendant and what he
might do that they moved F.G. from the bedroom facing the street to
the bedroom next to the backyard.   (7/17/12 RT 25:20-23).   Based on
Defendant's telephone call with F.G.'s mother, F.G. and her family
were scared he might harm F.G.   (7/17/12 RT 26:2-7).   Moreover,
within a week after her mother picked her up from work, F.G. was
still "crying all the time."   (7/17/12 RT 25:5-9).

 As a result of the above events targeting her and not knowing
what other harm was planned against her, F.G. reported the events
to the Glendale Police Department ("GPD") on September 15, 2007.
(7/17/12 RT 133:9-25).

 The next day, Sunday, September 16, 2007, Defendant sent an
email from truth.about.[f.g]@hotmail.com to Brian Evans and Pamela
Sanford at Alliant International University.   (Ex. 18).   Brian
Evans was the Director of Admissions for Alliant's campus in
Fresno; Pamela Sanford was the Director of Campus and Student
Services at the Fresno campus.   The email contained the subject
line, "Photographs of Fall, 2007 Applicant [F.G.]" and contained
three Shutterfly.com links, which directed Mr. Evans and Ms.
Sanford to sexually explicit photographs of F.G. that Defendant had
taken of F.G. during their relationship.   (7/18/12 RT 37:4-39:3;
Ex. 18).   Mr. Evans received the email and opened two of the links;
the first appeared to be an image of a sexual act, and the second
appeared to be an image of female anatomy.   (7/18/12 RT 37:15-23).
Mr. Evans then deleted the email.   F.G. later learned that an email

with sexually explicit photographs of her were sent to Alliant
University.  (7/17/12 RT 147:15-19).

F.G. did not return to work on Monday, September 17, 2007,
because she did not feel safe; Defendant was calling her family
repeatedly and she did not know what would happen next or if he
would show up at her office.  (7/17/12 RT 134:10-23).  She also
changed all of her accounts and changed her telephone number.  F.G.
only gave her new number to her family, not even to any of her
friends, because she did not know who else was involved with
helping Defendant and she did not trust anyone at that point.
(7/17/12 RT 134:24-135:8; 144:22-145:2; 7/18/12 RT 82:7-11).  F.G.
was so afraid of Defendant at that point that she listed her
sister's cell phone number on the police report (instead of her
own) because she didn't know who to trust.  (7/17/12 RT 135:9-12).

On September 17, 2007, J.B. emailed F.G. from his account to
her Hotmail account asking if she was OK.  (7/18/12 RT 24:19-25:25;
Ex. 32).  F.G. never saw that email because by then, Defendant had
exclusive control over F.G.'s Hotmail account and F.G. could not
access it.  (7/17/12 RT 141:3-19).  A copy of J.B.'s September 17,
2007, email to F.G. was found on Defendant's laptop computer.  (Ex.
52).[16]

On Tuesday, September 18, 2007, F.G. returned to PSI to meet
with the CEO, D.W. ("CEO D.W."), and her supervisor, M.S., to make
them aware of her past relationship with Defendant and the recent
acts targeting her, which F.G. believed were being caused by

---

[16]  It appeared to be "cut and pasted" directly from F.G.'s
Hotmail inbox.

Defendant given the timing of their breakup.  (7/17/12 RT 135:13-136:17; 7/18/12 RT 17:9-19:8).  It was a difficult conversation for F.G.; she explained that she did not feel safe and that she was not sure what else would be happening.  She wanted to know if D.W. would protect her and if it was safe for her to return to work. (7/17/12 RT 135:13-136:17).  CEO D.W. observed that during the meeting, F.G. was visibly upset and was crying; she appeared very emotional and distraught, as well as embarrassed and scared. (7/18/12 RT 19:9-18).  F.G.'s friend and coworker, A.A., saw her at PSI that day and also saw that F.G. was visibly upset, crying, and shaking, and could barely speak or look at A.A.  (7/18/12 RT 82:7-19).  F.G. left early that day because her mother was waiting for her to take her home.  (7/17/12 RT 136:22-23).

Sometime thereafter, Defendant called CEO D.W. and told him that F.G. was crazy, and asked if CEO D.W. wanted to see nude photographs of F.G.  When CEO D.W. said no, Defendant offered to email them to CEO D.W.  CEO D.W. told Defendant not to email them to him because he did not want them.  (7/18/12 RT 20:25-22:15).

On or about September 18, 2007, F.G.'s mother received the $330.67 and $555.55 checks that Defendant had sent through F.G.'s account, which were mailed to her home.  (7/17/12 RT 26:8-28:11; Exs. 1-2).  F.G. did not request those checks nor did she authorize anyone to send them, nor had she authorized Defendant to access her bank account.  (7/17/12 RT 128:14-15; 129:21-23, 136:18-138:25). Moreover, in the same time period, F.G. found out her bank card did not work at a gas station when she was trying to buy gas, because Defendant had changed her zip code.  It was "shocking" for F.G. not to be able to access her account.  (7/17/12 RT 141:9-24).

**D.      On September 18, 2007, Police Warned Defendant Not to Contact F.G. Directly or Indirectly Because it "Makes Her Afraid"**

On September 18, 2007, GPD Detective Eric Webber, who had been assigned to the investigation after F.G. filed her report, called Defendant to advise him that he was investigating the source of the emails and the identity theft involving F.G.'s accounts. (7/17/12 RT 222:16-226:2). During the call, Detective Webber repeatedly cautioned Defendant not to make any type of contact with F.G. directly or indirectly through third parties because such contact "makes her afraid" and "scares" F.G. (Ex. 35, 35A, p.2:3-4, 2:7, 2:22, 3:14-15; emphasis added). Defendant replied that he heard what Detective Webber was saying "loud and clear." (Ex. 35, 35A, p.3:4-5).

**E.      Despite Police Warning, Defendant Continued His Campaign to Harm F.G.**

On September 28, 2007 — despite Detective Webber's warning — Defendant created account jb1745@hotmail.com and used it to send emails to J.B., whom F.G. met at their mutual friends' (A.A. and B.Y.'s) wedding in August, and J.B.'s roommates. (7/18/12 RT 26:2-28:15; Ex. 20).[17]  Defendant's emails to J.B. and his roommates

-----

[17] Defendant's email stated:

Boo hoo hoo...but maybe you'll actually look at this slideshow for some [F.G.] 101. Also it appears the Oregon boys are as apathetic about their careers as they are about their personal lives. To live in San Diego - and Southern California in general - you need to earn a min. of $200K annually. Rounding errors in that sub-$100K category don't account for much here; maybe you can buy a house and some nice wheels in Corvalis with that kind of career, but not here. Then you have hitters like me, that know that the year is a failure if we don't eclipse $100K by Cinco de Mayo... Get it together players... Anyway, enjoy.

(Ex. 20).

(continued...)

16

1  attached Defendant's homemade 34-page Powerpoint digital slideshow

2  entitled "[F.G.] 101," containing several dozen pornographic

3  photographs of F.G. which Defendant had taken during their

4  relationship, along with shockingly vile captions disparaging F.G.,

5  her body, and her character ("the slideshow") (7/18/12 RT 34:3-16;

6  Ex. 20).[18]

7      Defendant sent the emails to J.B.'s personal email address,

8  which looked similar to email address jb1745@hotmail.com.[19]   J.B.

9  did not know Defendant and there was no reason for Defendant to

10  have J.B.'s email address or the email addresses of his roommates.

11  (7/18/12 RT 33:19-34:2).  The evidence showed that F.G.'s Hotmail

12  account contained, among other things, the August 18, 2007 email

13  from F.G. to J.B. at his personal email address (7/17/12 RT 141:25-

14  142:25; 7/18/12 RT 24:10-18; Ex. 31), and the September 17, 2007

15  email sent from J.B. using the same email address, a copy of which

16

17

_____

18      [17](...continued)

19  J.B. testified that his hometown is Corvalis, which made him
   concerned that Defendant had done background research on him.
20  (7/18/12 RT 28:22-29:1).  Defendant's Myspace messages to J.B.
   likewise contained background information regarding J.B., such as
21  the street where he and his roommates used to live.  (7/18/12 RT
   33:2-6).
22

23      [18]   The captions contained in the slideshow are too vulgar to
   repeat in this publicly filed document.

24      [19]   The court finds that the similarity increased the chances
   of J.B.'s friends opening the email and attachment.  Indeed, R.G.,
25  who had opened the email and attachment believing that J.B. had
   sent them, replied: "Damn it dude, I opened that shit in the school
26  library on my laptop," and went on to tell him not to send that
   type of email and that it made him feel "icky."  (Ex. 20, BS 2609).
27  The similarity also caused J.B. to be concerned because he didn't
   know if his account had somehow been hacked.  (7/18/12 RT 29:12-
28  30:12).

1  was found in Defendant's computer.  (7/18/12 RT 24:19-25:25; Exs.

2  32, 52).

3      After receiving these emails with the slideshow attached, J.B.

4  stopped communicating with F.G. because he did not understand what

5  was going on and he figured the best way to stop the emails from

6  Defendant would be just to cut off communication with F.G.

7  (7/18/12 RT 34:17-35:4).  J.B. testified that if Defendant had not

8  sent J.B. and his friends the email messages with the attached

9  slideshow, J.B. probably would have stayed in touch with F.G.

10  (7/18/12 RT 35:5-8).

11      Besides J.B. and his roommates, Defendant emailed the

12  slideshow to others, including A.A.'s husband (B.Y.) and F.G.'s ex-

13  boyfriend (T.I.).  (7/17/12 RT 155:25-157:6; 7/18/12 RT 85:5-10;

14  Ex. 49).  Defendant also emailed a copy of the slideshow to C.V.,

15  who was F.G.'s coworker at PSI.  (7/17/12 RT 89:17-92:12; Exs. 70-

16  71).  F.G. learned that Defendant had sent the slideshow to her

17  friends when A.A. forwarded some of the emails to her.  (7/17/12 RT

18  144:7-21).  When F.G. learned that the slideshow had been sent to

19  J.B., she felt "violated."  (7/17/12 RT 145:3-9).[20]

20  **F.  F.G. Obtained Restraining Order Against Defendant**

21      As a result of all of Defendant's acts targeting her, as

22  described above, F.G. thereafter obtained a restraining order

23  against Defendant.  (7/17/12 RT 147:3-8).

24  ///

25

26      [20]  As noted in comments at the close of testimony, the court
    preliminarily found F.G.'s testimony that she felt "violated" to be
27  credible:  "[A]t one point, Ms. [G.] said she felt that she had
    been violated.  And I fully understand why she said that.  And I
28  thought that there was a lot of credibility to the way that she
    described how she felt."  (7/18/12 RT 106:16-19).

18

**G.     Search of Defendant's Car on October 3, 2007**

On October 3, 2007, following further investigation, the GPD executed a search warrant for Defendant's office at Red Mango and his car, which was parked at Red Mango.  In Defendant's car, the police detectives found file folders containing personal and financial information regarding F.G. and other items, including:

- Computer printouts dated September 11, 2007, from F.G.'s online Bank of America account, reflecting checking account activity from May 7, 2007, through September 10, 2007.  (Ex. 43).

- A computer printout dated September 11, 2007, from F.G.'s online Bank of America account reflecting an "update" to F.G.'s account address and telephone numbers. (Ex. 43).

- Multiple copies of a two-page flyer entitled "Attention [J.B.]" containing five pornographic photographs of F.G. that Defendant had taken during their relationship, along with vile and disparaging comments about F.G.[21]  (Ex. 43).  The flyer also gave the following warning to J.B.:

> As the saying goes, we can do this the easy way or the hard way.  The easy way entails the following: you man up, objectively contemplate the fucking disaster in your midst, and open your eyes to the insane, unbalanced risks you are about to take with this person in your life in any capacity.  The hard way entails the following: <u>I unleash a furious, unrelenting hailstorm of information on every single person you know – that you call family or friend, that you work with, that you socialize with, that you myspace with, that you network with, that you may or may not interact with in the future, that you share the roads with in America's Finest City – unveiling the true colors of the mole-infested person that you're associating with at this time</u>.  The pictures and videos alone will fuck you up beyond what you're equipped to handle, of that you can be sure.

*     *     *

---

[21]  For example, the flyer falsely stated that F.G. (whom the flyer identified by name) "is a deeply troubled, pathological liar" who is having sex with many partners and with people who "she knows her parents would disown her over," is a "dysfunctional individual with untreated, clinical narcissism," and "has herpes, simplex 2 and has tested positive for HIV and TB in the past." (Ex 43).

1         Do yourself a favor and e-mail me at
2         truth.about[f.g.]@hotmail.com for even more
        embarrassing details about the filthy, lying precipice
        that you are standing in front of....

3

     (Ex. 43; emphasis added).

4

-   Computer printouts dated August 24, 2007, from F.G.'s Hotmail
5     account.  (Ex. 44).

6 •   Account information for Defendant's email account
    jb1745@hotmail.com.  (Ex. 44).

7

8 •   A receipt for the purchase of a Keyghost keystroke logger
    purchased on July 30, 2007.  (Ex. 44).

9 •   A laptop computer.  (Ex. 41).

10 (Exs. 43-44; 7/17/12 RT 226:11 -238:23).

11 **H.   Defendant's Admissions During Police Interview**

12      During the execution of the search warrant, Defendant told

13 Detective Jenks that he made the F.G. slideshow because F.G. lied

14 to him or betrayed him; he also admitted to detectives that he had

15 taken nude photographs of F.G. and sent them to her father, and

16 further acknowledged sending the F.G. slideshow to J.B.  (7/18/12

17 RT 7:1-11:15; Exs. 38, 38A).  Defendant also conceded that if he

18 suddenly had a $3,000 bill on his credit card, it would not impact

19 him, but that it would "probably" impact F.G.  (Exs. 38, 38A, p.6).

20 **I.   Forensic Search of Defendant's Laptop**

21      Defendant's laptop computer, which had been seized from his

22 car, was later searched by the FBI, and found to contain the

23 following:

24 •   A text document listing categories "e-copies," "viewed,"
    "photos," and "aware," with names listed under each category
25     reflecting those to whom Defendant emailed the F.G. slideshow,
    those who viewed it, those who saw photos, or those who were
26     aware of the photos.  (Ex. 49).

27 •   A six-page text document meticulously listing accounts,
    passwords and other information relating to F.G.'s various
28     accounts, including Hotmail, Yahoo!, Bank of America, Myspace,

and Shutterfly, as well as changes made to F.G.'s various online accounts. (Ex. 50). For example, under "Bank of America," it stated: "Old login: [F.G.]", "New login: [F.2007G.]," "Old passcode: [redacted]," "New passcode [redacted]." The list also contained the names and personal identifying information of F.G.'s family, friends, and coworkers, including friends from high school, her co-workers at PSI, her brother-in-law, her cousins, and her cousin's wife. (7/17/12 RT 157:22-163; Ex. 50).

- A copy of the September 17, 2007 email sent by J.B. to F.G. at her Hotmail account. (Ex. 52).

- A draft email to J.B.'s friends with derogatory comments regarding F.G. attaching the <u>same</u> three Shutterfly links included in the email sent to Brian Evans at Alliant University. (Ex. 53).

- A document listing seven points, one of which states, "Access to hotmail, yahoo, linkedin, shutterfly, bankofamerica.com, amazon.com, bombaycompany.com," and another which read "Intercepted email from Best Western, Blue Sea Lodge hotmail account." (Ex. 54).

- Yahoo Instant Messages dated 8-20-07 through 8-30-07 between Defendant and F.G. (Ex. 55).

- Three versions of the "Attention: [J.B.]" flyer that was found in Defendant's car (and posted on the door of J.B.'s prior residence). (Exs. 56-58).

- Three versions of the "[F.G.] 101" Powerpoint digital slideshow that Defendant sent to J.B., C.V., and others. (Exs. 59-61).

- The six sexually explicit photographs of F.G. that Defendant emailed to F.G.'s father. (Exs. 62-67; 7/18/12 RT 46:3-48:21, 55:15-57:23).

**J.   <u>Duration of F.G.'s Severe Emotional Distress</u>**

In addition to F.G.'s emotional distress as witnessed by her mother and CEO D.W., F.G.'s friend and then co-worker, A.A., testified to changes she noticed in F.G.'s behavior at PSI as a result of Defendant's acts. Within six months to a year after the events of September 2007 as described above, F.G. still was not comfortable driving her own car to the office, and had to be driven by a parent or a friend and picked up on a regular basis. F.G. was

1   concerned that if she drove her car to work, Defendant would see it
2   and tamper with it or follow her and she was concerned with her
3   safety while driving her car.  (7/18/02 RT 82:20-83:3, 84:4-9).   In
4   addition, during that time period, A.A. and others at PSI would
5   escort F.G. around the office because F.G. never wanted to be left
6   alone.  (7/18/12 RT 83:3-5).

7       Between a year and 18 months after the September 2007 events
8   described above, there were at least two times when F.G. started
9   crying uncontrollably during work at PSI because of Defendant's
10  conduct against her.  When this happened, A.A. went with F.G. into
11  a private office and F.G. cried and tried to make sense of what was
12  going on and why somebody she cared about would do this to her.
13  (7/18/12 RT 83:5-10).

14      In addition, within six months to a year after the events of
15  September 2007, A.A. learned that F.G. had become very concerned
16  about her safety at home.  (7/18/12 RT 84:10-14).  For example,
17  when F.G. saw footsteps in the garden directly outside her window,
18  she became extremely upset thinking that somebody was watching her
19  or following her, even though the footsteps belonged to the
20  gardener.  (7/18/12 RT 84:14-21).  Moreover, every time F.G. and
21  A.A. went somewhere, F.G. never felt comfortable, and she is still
22  concerned with her safety today and still hurt by what Defendant
23  did to her.  (7/18/12 RT 84:24-85:4).

24      During F.G.'s testimony, she also broke down crying at times,
25  particularly when testifying regarding the sexually explicit
26  photographs that Defendant sent to her father and others.  (See,
27  e.g., 7/17/12 RT 125:8-126:19).
28  ///

22

## CONCLUSIONS OF LAW

Based on the above factual findings, and other evidence presented at trial, the court concludes that the Government has met its burden and proven beyond a reasonable doubt that Defendant is guilty of Counts One through Five and Nine through Eleven of the Indictment.  The court concludes that Defendant is not guilty of Counts Six through Eight.

### A.   "In Furtherance"

Counts One through Five, for unauthorized use of a computer in violation of 18 U.S.C. § 1030, become felonies if the Government proves beyond a reasonable doubt that these charges were "committed in furtherance of any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."  18 U.S.C. § 1030(c)(2)(B)(ii).  The Government alleges that Defendant committed Counts One through Three in furtherance of: 1) Bank Fraud, 18 U.S.C. § 1344; 2) false personation, Cal. Penal Code § 529(a)(3); and 3) intentional infliction of emotion distress ("IIED"), a California common law tort.  The Government also alleges that Defendant committed Count Four in furtherance of the two state law violations, and Count Five in furtherance of the IIED only.[22]

As an initial matter, Defendant argues that the Government must prove, beyond a reasonable doubt, each of the elements of the criminal and tortious acts allegedly satisfying the "in furtherance" requirement.  In so arguing, Defendant analogizes to

---

[22]   At the Government's request, the court strikes the allegation in Count Five that Defendant's offense was committed in furtherance of false personation.

23

1    case law regarding similar language from 18 U.S.C. § 924(c)(1)(A),

2    for use of a firearm.  The Government disagrees and contends that

3    it need only prove that Defendant intended to commit the alleged

4    criminal and tortious acts, citing to case law interpreting similar

5    language from the Wiretap Act, 18 U.S.C. § 2511(1)(d).

6        The court finds that it is not necessary to resolve this legal

7    issue here, because – as discussed below – the Government has

8    sufficiently proven all of the elements of the two state law

9    violations.  Although, as also explained below, the court finds

10   that Defendant is not guilty of – and did not commit any of Counts

11   One through Four in furtherance of – bank fraud under 18 U.S.C. §

12   1344.

13   **B.    Counts One Through Three (Computer Intrusion, Bank of America)**

14       Based on the evidence presented at trial, the court finds that

15   the Government has proven beyond a reasonable doubt that (1)

16   Defendant intentionally accessed without authorization a computer

17   belonging to Bank of America, and (2) by such access, obtained

18   information contained in the records of Bank of America, as alleged

19   in Counts One through Three.

20       The court further finds, as discussed in more detail below,

21   that the Government has proven beyond a reasonable doubt that

22   Defendant committed the misdemeanor offenses alleged in Counts One

23   through Three in furtherance of <u>each</u> of the following criminal and

24   tortious acts: false personation, in violation of California Penal

25   Code section 529(a)(3), and intentional infliction of emotional

26   distress, under California tort law.

27   ///

28   ///

24

**C.    Count Four (Computer Intrusion, Amazon.com)**

Based on the evidence presented at trial, the court finds that the Government has proven beyond a reasonable doubt that (1) Defendant intentionally accessed without authorization a computer belonging to Amazon, and (2) by such access, Defendant obtained information from a computer that was used in or affected commerce or communication between one state and another state or between states of the United States and a foreign country, as alleged in Count Four.

The court further finds that the Government has proven beyond a reasonable doubt that Defendant committed the misdemeanor offense in furtherance of <u>each</u> of the following criminal and tortious acts: false personation, in violation of California Penal Code section 529(a)(3), and intentional infliction of emotional distress, under California tort law.

**D.    Count Five (Computer Intrusion, Hotmail)**

Based on the evidence presented at trial, the court finds that the Government has proven beyond a reasonable doubt that (1) Defendant intentionally accessed without authorization a computer belonging to Microsoft/Hotmail, and (2) by such access, Defendant obtained information from a computer that was used in or affected commerce or communication between one state and another state or between states of the United States and a foreign country, as alleged in Count Five.

In addition, the court finds that Defendant accessed without authorization F.G.'s Hotmail account, and obtained the contents of her email account, including, among other things: F.G.'s father's email address; the August 18, 2007 email from F.G. to J.B. at his

1    personal email account; and the September 17, 2007 email sent from
2    J.B. to F.G. using his personal email account.

3        The court further finds that the Government has proven beyond
4    a reasonable doubt that Defendant committed the misdemeanor offense
5    in furtherance of the following tortious act: intentional
6    infliction of emotional distress, under California tort law.

7    **E.    Counts Six Through Eight (Bank Fraud)**

8        Based on the evidence presented at trial and this particular
9    set of facts, the court finds that the Government has not proven
10   beyond a reasonable doubt that Defendant acted with intent to
11   defraud Bank of America ("Bank"), as alleged in Counts Six through
12   Eight of the Indictment.  Accordingly, the court finds Defendant
13   not guilty of Counts Six through Eight of the Indictment.

14       In particular, the court agrees with Defendant that he did not
15   intend to defraud the Bank, but rather intended solely to cause
16   harm to the victim of his overall scheme: F.G.

17       As the parties agree, such bank fraud is a specific intent
18   crime, and the "intent to defraud" means "an intent to deceive or
19   cheat."  9th Cir. Manual of Model Crim. Jury Instructions No. 3.16
20   (2010).  The Government argues that Defendant must have intended to
21   deceive the Bank when he used F.G.'s log-in information to gain
22   access to F.G.'s account on the Bank's servers.  In doing so,
23   argues the Government, Defendant intentionally deceived the Bank
24   into believing that he was F.G. or an authorized user.  Defendant
25   contends, to the contrary, that at most any deception was merely
26   incidental to his intent to defraud or otherwise target F.G.  The
27   court agrees with Defendant.

28

1    As Defendant notes, the Third Circuit has held that such
2    conduct does not constitute bank fraud.  See, e.g., United States
3    v. Thomas, 315 F.3d 190, 202 (3d Cir. 2002) (finding that
4    defendant's unauthorized use of pre-signed checks did not violate
5    the statute, because "[e]ven a scheme which does expose a bank to a
6    loss must be so intended"); id. at 199 ("[C]onduct . . . does not
7    fall within the ambit of the bank fraud statute when the intention
8    of the wrongdoer is not to defraud or expose the bank to any loss
9    but solely to defraud the bank's customer.").  As the Third Circuit
10   explained, this interpretation is consistent with the legislative
11   intent.  See id. at 200 ("The legislative history shows that
12   Congress sought to allay crimes that undermined public confidence
13   in banking institutions. . . .  The deception of a bank as an
14   incidental part of a scheme primarily intended to bilk a bank
15   customer does not undermine the integrity of banking."); United
16   States v. Leahy, 445 F.3d 634, 647 (3d Cir. 2006) ("[W]here the
17   bank is not the target of deception, but rather merely an unwitting
18   instrumentality, there is the additional concern that § 1344 may be
19   applied in a manner that reaches conduct that falls well beyond the
20   scope of what the statute was intended to regulate." (internal
21   quotation marks omitted)).  The court finds this reasoning
22   persuasive.  Otherwise, the federal bank fraud statute would
23   stretch broadly to cover many typical state law crimes, where the
24   fraud is actually against the account holder.
25       Here, as in Thomas, Defendant's clear intent was to defraud or
26   otherwise harm the account holder, and any deception of the bank
27   was incidental to this scheme.  See Thomas, 315 F.3d at 202 ("[T]he
28   court . . . must look to the entire circumstances of defendant's

conduct as an indication of the requisite criminal intent. [Defendant's] actions, in fact, demonstrate that she never intended to victimize the banks.  Her only victim was [the account holder]." (internal quotation marks omitted)).  As the Government itself contends, all of Defendant's actions here were intended to cause severe emotional distress to F.G.  Thus, to the extent Defendant deceived the Bank, he was merely using it as an "unwitting instrumentality."  In fact, a rule of "inverse proportionality" may often apply in cases such as this one - where the greater the focus on harming the victim, the less likely that defendant actually intended to defraud the bank.  Again, Defendant's sole, singular, and obsessive motivation here was causing harm to F.G.  The court therefore finds that Defendant was so bent on this personal vendetta against F.G. that he in no way contemplated deceiving or defrauding the Bank.

**F.    Counts Nine Through Eleven (Aggravated Identity Theft)**

Based on the evidence presented at trial that Defendant, without authorization, knowingly used F.G.'s log-in ID and password to access her online Bank of America account and knowingly used F.G.'s username and password to access her Amazon.com and Hotmail accounts, the court finds that the Government has proven beyond a reasonable doubt that: (1) Defendant knowingly transferred, possessed, or used without legal authority a means of identification of another person, namely, F.G.; (2) Defendant knew that the means of identification belonged to a real person; and (3) Defendant did so during and in relation to the following predicate felony violations:

28

| Count | Date | During and In Relation To Felony Charged in Count: |
|---|---|---|
| Nine | 9-13-07 | Count Four (Amazon.com Intrusion, in furtherance of IIED and False Personation) and Count Five (Hotmail Intrusion, in furtherance of IIED) |
| Ten | 9-18-07 | Count Two (Bank of America Intrusion, in furtherance of IIED and False Personation) |
| Eleven | 9-19-07 | Count Three (Bank of America Intrusion, in furtherance of IIED and False Personation) |

## G. **False Personation**

As mentioned, the court finds that the Government has proven beyond a reasonable doubt that the misdemeanor offenses charged in Counts One through Four were committed in furtherance of false personation, in violation of California Penal Code section 529(a)(3).

The court finds that the Government has proven each of the elements of false personation beyond a reasonable doubt, including that: (1) Defendant falsely personated another, namely, victim F.G., in her private capacity (and did so intentionally); and (2) in such assumed character, Defendant committed an act that, if done by the victim, the victim might have become liable to pay any sum of money or incur any charge, forfeiture, or penalty. In particular, the court finds that with respect to Count Four (the Amazon.com intrusion), as soon as Defendant accessed F.G.'s Amazon account and clicked the "Submit" button to purchase the goods with F.G.'s Citibank Mastercard credit card, if done by F.G., F.G. might have become liable to pay that credit card charge, i.e., liable to pay any sum of money or incur any charge, forfeiture, or penalty. Likewise, the court finds that with respect to Counts One through

29

1  Three (the Bank of America intrusions), as soon as Defendant
2  accessed F.G.'s bank account online and confirmed his request that
3  checks be issued from her checking account, if done by F.G., F.G.
4  might have become liable to pay the amount of those checks or
5  charges associated therewith, i.e. to pay any sum of money or incur
6  any charge, forfeiture, or penalty.

7  **H.    Intentional Infliction of Emotional Distress**

8       As to the allegations in Counts One through Five that the
9  misdemeanor offenses were committed in furtherance of intentional
10  infliction of emotional distress ("IIED") against F.G., the court
11  finds that the Government has proven beyond a reasonable doubt that
12  Defendant committed each of those misdemeanor offenses as part of a
13  coordinated, orchestrated, relentless, and continuing campaign to
14  destroy every facet of F.G.'s life, including, among other things:
15  (1) to disrupt her financial affairs by taking away her ability to
16  use her Bank of America accounts and Citibank credit card account;
17  (2) to ruin her relationship with her family by emailing graphic
18  sexual photos of F.G. to her father, along with multiple email
19  messages disparaging F.G.; (3) to interfere with her future career
20  by sabotaging her chances for admission to attend the graduate
21  program at Alliant University where Defendant knew she was
22  applying; and (4) to destroy her chance for a future romantic
23  relationship with J.B. by sending him, and some of his friends, the
24  Powerpoint digital slideshow.  The court also finds that Defendant
25  did all of this in order to intentionally inflict emotional
26  distress on F.G.  Defendant was so obsessed with this campaign that
27  he committed part of the scheme even after being advised by GPD
28  Detective Eric Webber that he was conducting an investigation into

30

the emails and activity on F.G.'s online accounts, and after being
told not to contact F.G. either directly or indirectly through
third parties because such contact made her afraid.  Accordingly,
based on the above, the court finds that the Government has proven
beyond a reasonable doubt that each of Defendant's misdemeanor
offenses was committed in furtherance of Defendant's campaign to
cause the intentional infliction of emotional distress upon F.G.

Further, even if the court were to analyze Count 5 on its own
– the only count not already held to be committed in furtherance of
the criminal act of false personation – the court would find that
the Government proved beyond a reasonable doubt that the
misdemeanor offense in Count Five (the Hotmail.com intrusion),
taken alone, was committed in furtherance of IIED for the following
reasons, among others: (1) the evidence showed that F.G.'s father's
personal email address was in F.G.'s Hotmail address book when
Defendant accessed her account, and that this was the email address
Defendant used to email sexually explicit photos of F.G. to F.G.'s
father, along with email messages disparaging F.G. and repeatedly
imploring F.G.'s father to view the photographs, which he re-sent
in an effort get F.G.'s father to view them; and (2) the evidence
showed that F.G.'s Hotmail account had contained an August 18, 2007
email from F.G. to J.B. at his personal email account and a
September 17, 2007 email sent from J.B. using his personal email
account to F.G., that a copy of the September 17, 2007 email from
J.B. to F.G. was found in Defendant's computer (which Defendant
apparently cut and pasted directly from F.G.'s Hotmail account),
and that Defendant used that email address of J.B. to send J.B. the
sexually explicit Powerpoint digital slideshow.

1       Based on the evidence presented at trial, the court also finds
2  that the Government has proven beyond a reasonable doubt each of
3  the elements of intentional infliction of emotional distress.  The
4  elements of IIED, as applied here, are as follows: (1) Defendant's
5  conduct was outrageous; (2) Defendant either intended to cause F.G.
6  emotional distress or acted with reckless disregard of the
7  probability that F.G. would suffer emotional distress; (3) F.G.
8  suffered severe emotional distress; and (4) Defendant's conduct was
9  a substantial factor in causing F.G.'s severe emotional distress.
10      First, the court finds that Defendant's conduct went "beyond
11  all possible bounds of decency, and [is] regarded as atrocious, and
12  utterly intolerable in a civilized community."  Hailey v. Cal.
13  Physicians' Serv., 158 Cal. App. 4th 452, 474 (2007) (alterations
14  and internal quotation marks omitted).  As the Government has
15  fairly summarized:  "The evidence showed that from August through
16  October, 2007, Defendant engaged in a calculated and meticulously
17  planned campaign to ruin F.G.'s life by attacking every facet of
18  her life: her financial stability, her relationship with her
19  parents, her current career, her future education and career, her
20  relationships with her friends and her potential romantic
21  relationship with J.B."
22      Second, as noted above, the court finds that Defendant
23  intended to cause F.G. emotional distress, based on the evidence at
24  trial, including the facts set forth above.
25      Third, the court finds that F.G. suffered severe emotional
26  distress.  The court makes this finding based upon the testimony
27  and other evidence cited above and presented at trial, as well as
28  the court's personal observations of F.G. during her testimony as

described above.  The court finds that the testimony of F.G. as well as the testimony of her mother, Red Mango CEO D.W., and her friend and former PSI coworker A.A. regarding F.G.'s emotional distress from Defendant's acts to be credible and sufficient to prove beyond a reasonable doubt that F.G. suffered severe emotional distress.  These witnesses testified directly as to F.G.'s severe emotional distress and as to F.G.'s behavior from which such distress can reasonably be inferred, including F.G.'s crying all of the time and feeling violated, ashamed, and too afraid to drive her car, go to work, or stay in her own room in her home.  As the Government fairly summarizes: "it is hard to imagine something more emotionally traumatic and devastating to a young woman living with her parents, with a traditional cultural background, than finding out that private pornographic photos of her engaging in sex acts with someone she had loved and trusted were sent by him to her father, as well as numerous other people she knew."

Finally, the court finds that not only was Defendant's conduct a substantial factor in causing F.G.'s severe emotional distress, it was the only factor.

In arguing to the contrary, Defendant first contends that any emotional distress that he caused to F.G. did not rise to the requisite level of severity.  For all of the reasons discussed, the court disagrees.  The court also finds Defendant's specific argument unpersuasive.  First, it is irrelevant that F.G. has not brought a civil suit for damages or sought mental health treatment. Many victims do not want to reopen their severe emotional trauma, or simply lack the money and time.  Second, although expert testimony may be important in some IIED cases, it was not necessary

33

1   here.  The court, as the factfinder in this bench trial, was able

2   to determine that F.G. suffered severe emotional distress, without

3   any expert testimony.  Last, contrary to Defendant's contention, it

4   is immaterial that F.G. admitted to exposing her breasts online on

5   a dating website, sometime after Defendant's criminal acts.

6   Whatever an adult may choose to do for themselves in their personal

7   life is irrelevant to how much harm that individual would suffer

8   from someone else disseminating pornographic images of that

9   individual to his or her family, friends, co-workers, and school

10  administrators, against that individual's will.

11         Defendant also argues that even if F.G. did suffer severe

12  emotional distress, the acts charged in the misdemeanor counts –

13  making unauthorized changes, distributions, and purchases using

14  F.G.'s Bank of America, Amazon.com, and Hotmail accounts – were not

15  in furtherance of the IIED, because the IIED resulted primarily

16  from Defendant's dissemination of naked photos of F.G.  The court

17  disagrees.  As explained, the court finds that all of Defendant's

18  acts of harassment were part of the same course of conduct to ruin

19  F.G.'s life and cause her severe emotional distress.  Contrary to

20  Defendant's suggestion, none of these acts were harmless.  For

21  instance, Defendant set up payments such that F.G.'s Bank of

22  America account would be at or below a zero account balance.

23  Defendant also deleted all, or at least many, of F.G.'s emails from

24  her Hotmail account, and sent emails to F.G. from her own account,

25  mocking her.  Further, as discussed above, even looking at the

26  unauthorized access to F.G.'s Hotmail account on its own, the

27  evidence establishes that this violation was in furtherance of the

28

34

1   IIED, because Defendant obtained one of F.G.'s father's and J.B.'s

2   email addresses from the account, and likely others as well.

3       Finally, Defendant argues more broadly that interpreting §

4   1030's felony enhancement to include violations committed in

5   furtherance of state common law torts is unconstitutional.  In

6   particular, Defendant contends that "allowing basic common law

7   torts to form the basis of federal felony liability could create

8   ever-expanding and unpredictable results when applied."  The court

9   declines to so rule.  The court notes, however, that Defendant's

10  concerns are not unreasonable.  Although this criminal prosecution

11  involves only intentional torts, prosecutors could arguably seek

12  the felony enhancement in other cases on the basis of common law

13  torts that require only negligence for the mens rea - such as

14  negligent infliction of emotional distress.

15

16

17

18

19

20

21

22

23

24

25

26  ///

27  ///

28  ///

## CONCLUSION

In sum, the court finds Defendant guilty of Counts One through Five and Counts Nine through Eleven of the Indictment.  The court also finds Defendant subject to the felony enhancement for Counts One through Five, because Defendant committed Counts One through Four in furtherance of false personation, in violation of California Penal Code section 529(a)(3), <u>and</u> intentional infliction of emotional distress, a California common law tort; and because Defendant Committed Count 5 in furtherance of the intentional infliction of emotional distress.  The court, however, finds Defendant not guilty of Counts Six through Eight, because Defendant did not intend to defraud any financial institution.

IT IS SO ORDERED.

Dated: September 12, 2012

DEAN D. PREGERSON
United States District Judge